`

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| | : | |
| LOCAL 491, INTERNATIONAL | : | |
| BROTHERHOOD OF POLICE | : | |
| OFFICERS, and JAMES | : | |
| FOUCHIA, | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION NO. |
| | : | 1:06-CV-0303-RWS |
| v. | : | |
| | : | |
| GWINNETT COUNTY, GA. and | : | |
| CHARLES M. WALTERS, | : | |
| individually and in his capacity as | : | |
| Gwinnett County Police Chief, | : | |
| | : | |
| Defendants. | : | |

## ORDER

Now before the Court are Plaintiffs' Motion for Partial Summary

Judgment [28] and Defendants' Motion for Summary Judgment [32].  After

reviewing the record, the Court enters the following Order.

### Background

This is a civil rights action brought pursuant to 42 U.S.C. § 1983.

Plaintiffs James Fouchia and Local 491, International Brotherhood of Police

Officers ("Local 491") sue Gwinnett County, Georgia, and its Chief of Police, Charles M. Walters, challenging two conditions of Gwinnett County's employment of police officers.  First, Plaintiffs challenge the constitutionality of a policy prohibiting off-duty police officers from wearing the Gwinnett County police uniform while attending meetings of the Gwinnett County Board of Commissioners.  And second, Plaintiffs allege that their First Amendment and Equal Protection rights were violated by an Internal Affairs investigation into allegedly "mutinous" statements made by Officer Fouchia while on-duty.

## I.      The Parties

Plaintiff James Fouchia is a Police Officer employed by the Gwinnett County Police Department.  He also serves as President of Local 491, a union comprised of approximately 181 Gwinnett County police officers holding the rank of Lieutenant or lower.  Local 491 is actively involved in political organization and advocacy at the county level, and Officer Fouchia occasionally attends Gwinnett County Board of Commission meetings on behalf of Local 491 to discuss officer pension plans, pay scale, promotions, recruitment, safety, and other issues of concern to both Gwinnett County police officers and the

AO 72A
(Rev.8/82)

public at large.  Defendant Charles M. Walters is the current Gwinnett County

Police Chief, and has served in that capacity since 2003.

## II.     The Uniform Policy

Chief Walters and Gwinnett County maintain a policy that prohibits

police officers from wearing the Gwinnett County police uniform off-duty

except under limited and specifically approved circumstances.  Section 305.10

of the Gwinnett County General Directives Manual ("GDM"), the written code

of conduct for Gwinnett County police officers, provides as follows:

> The Gwinnett County Police uniform identifies the
> wearer as a police professional and helps establish a
> command presence.  The uniform should be worn
> with pride and in a manner that lends itself to
> consistency from one officer to the next.  *The uniform
> is not designated and not intended to be a vehicle for
> individual expression.*  Rather is it [sic] intended to
> provide the officer with clothing and equipment
> required to meet law enforcement objectives while
> expressing a conservative appearance for the
> department.  These regulations are established to
> ensure uniformity and consistency in appearance
> among those wearing the uniform of the department.
>
> . . . .
>
> *The uniform is required to be worn during work,
> travel to and from work, and while operating a
> marked vehicle, and is approved for wear only at*

3

> *these times or while engaged in other official police*
> *business or functions approved by the Chief of Police.*

(See Gwinnett County Police Department GDM § 305.10 (Ex. A to Walters

Aff. [32-4]) (emphasis added).)

Gwinnett County police officers are also authorized to wear their uniform

while working off-duty in second jobs that relate to the policing function.  Rule

418.06 of the GDM provides that "Uniforms, vehicles, radios, issued weapons,

and other county equipment may be utilized for [police-related] employment as

deemed appropriate and approved by the Division Commander or his designee."

(See Ex. 3 to Pl.'s Resp. to Defs.' Mot. for Summ. J. [37-4].)

As a matter of practice, Chief Walters also allows officers to wear their

uniforms while running errands or conducting other personal business

incidental to the work commute.  Gwinnett County police officers may thus

visit a grocery store in uniform on their way home from work and conduct other

routine errands in uniform.  As a general matter, however, officers are

prohibited from wearing their uniform to county commission meetings, even if

they attend such meetings in between work shifts, unless they are on official

business or already at the Lawrenceville public building for a court appearance.

4

In his Affidavit, Chief Walters says that he enforces the policy against making public appearances in uniform as follows:

> A police officer may attend a public meeting [in uniform] if he is (1) on duty; (2) he has official police business at the government building in Lawrenceville; [or] (3) while at the government building he is on a designated break such as a recess from a court proceeding in which he is appearing as a witness. Otherwise, when a police officer is in uniform he is expected to be performing his job duties such as patrolling his assigned zones or investigating criminal cases.

(Walters Aff. ¶¶ 13-14.)

According to Chief Walters, the purpose of the uniform policy is to foster a "command presence."  (Id. ¶ 16.)  It fosters "public safety because the uniform identifies the officer to citizens in need of assistance, establishes control over suspects and promotes order at emergency and crime scenes." (Id. ¶ 17.)  Chief Walters also states that maintaining "[t]he integrity of the department in the eyes of the citizens and the governing body is essential to its ability to carry out its law enforcement responsibilities."  (Id. ¶ 20.)  In order to "ensure that the department as a whole will be viewed by the public and the commissioners as neutral on political issues, in political forums, and in matters

5

of importance to the entire department," Chief Walters allows only one

spokesperson for the department to address the Board of Commissioners.  (Id. at

21.)

Prior to 2003, under Gwinnett County's former Chief of Police, Officer

Fouchia attended public meetings in uniform without objection, even though he

was admittedly off-duty and not speaking on behalf of the Gwinnett County

Police Department.  In 2003, however, after Defendant Walters became the

Chief of Police, he announced that officers were not permitted to adorn their

police uniform while attending meetings of the Board of Commissioners in their

private capacities.

Plaintiffs maintain that the policy enforced by Chief Walters violates the

First Amendment because it burdens their freedom to speak on matters of public

concern and dilutes the political message they seek to convey at public

meetings.

## III.    Internal Affairs Investigation

In their second allegation, Plaintiffs assert that Defendants

unconstitutionally inquired into their off-duty union activity while investigating

allegedly "mutinous" statements made by Officer Fouchia while on duty.

6

Officer Fouchia also claims that Defendants violated his rights under the Equal

Protection Clause because Internal Affairs failed to notify him of the inquiry or

offer him the opportunity to respond.

In November 2004, Officer James Jenkins reported overhearing Officer

Fouchia saying, while on duty in the Northside Precinct, that he was actively

involved in recruiting and interviewing candidates for police chief to potentially

replace Chief Walters.  Officer Fouchia allegedly stated that he was assigned

that task by the newly elected Chair of the Gwinnett County Board of

Commissioners, and he "had to work all night and stay up the next day because

he was picking up candidates for Police Chief who were flying in from the

Chicago Airport . . . the next day."  (See Pl.'s Resp. to Defs.' St. of Mat. Facts

[37-5] ¶¶ 15-16.)  Officer Fouchia also allegedly said that he was directed to

"decide who, among the persons interviewed, he would like to pick as the next

chief."  (See Pl.'s Resp. to Defs.' St. of Mat. Facts [37-5] ¶ 19.)

Officer Jenkins reported what he heard at the Northside Precinct to

Assistant Police Chief Daniel Bruno and Chief Walters.  Because "[t]he

statements attributed to Fouchia by Jenkins concerned [Chief Walters] because

it appeared an unranked patrol officer threatened to foster mistrust, impair

morale, and create factions among the officers," Chief Walters reported the matter to the Internal Affairs/Professional Standards Unit of the Gwinnett County Police Department for further investigation. (Walters Aff. ¶ 31.)[1] Shortly thereafter, Internal Affairs initiated an "inquiry" into Officer Fouchia's conduct and statements.[2]

Two Internal Affairs investigators, Sergeant Patrick T. Cronin and a Lieutenant Moulder, began the inquiry into Officer Fouchia's statements to determine whether Officer Fouchia should be disciplined for engaging in "mutiny" or other conduct unbecoming of a police officer. As a part of their investigation, Sgt. Cronin and Lt. Moulder interviewed three Gwinnett County Police Officers, all of whom were members of the Executive Board of Local 491. The officers were required by Department policy "to answer the questions

---

[1] Plaintiffs state that only "Assistant Chief Bruno . . . interviewed Jenkins and . . . made the assignment to Internal Affairs." (See Pl.'s Resp. to Defs.' St. of Mat. Facts [37-5] ¶ 17.)

[2] An Internal Affairs "inquiry" "deals with a question about a policy or procedure of the Gwinnett County Police Department, or action taken by personnel employed by the Department." (See Pl.'s St. of Mat. Facts [28-2] ¶ 30; Defs.' Resp. to Pl.'s Statement of Material Facts [36-11] ¶ 30 (quoting "Internal Affairs Procedures Manual" at 1).) An Internal Affairs "inquiry" is distinct from a more formal "investigation," which follows the filing of a formal "complaint" by a fellow employee/supervisor or citizen stating that "an employee has committed an act of misconduct." (See Pl.'s St. of Mat. Facts [28-2] ¶ 31-32.)

put to them or face possible disciplinary action for insubordination."  (See Pls.'s Stmt. of Mat. Facts [28-2] ¶ 42; Defs.' Resp. to Pls.'s Stmt. of Mat. Facts [36-11] ¶ 42.)

The Internal Affairs officers first interviewed Sgt. Van Nus, a known member of the Executive Board of Local 491.  During the interview, Sgt. Cronin asked Sgt. Van Nus about his participation in the leadership of the Local 491, and whether the Executive Board of the Local 491 had expressed an opinion about whether to "get rid" of Chief Walters.  (See Pl.'s St. of Mat. Facts [28-2] ¶ 47; Defs.' Resp. to Pl.'s Statement of Material Facts [36-11] ¶ 47.)

Sgt. Cronin and Lt. Moulder next interviewed Sergeant James Jolly, also aware that he was a member of the Executive Board of Local 491.  They asked similar questions regarding the activities of the Local 491 and whether members of the Local 491 Executive Board "had spoken to Commissioner Bannister of the Gwinnett County Board of Commissioners about the [Local 491] having input in the selection of a new Chief of Police."  (See Pl.'s St. of Mat. Facts [28-2] ¶ 51; Defs.' Resp. to Pl.'s Statement of Material Facts [36-11] ¶ 51.)

Finally, Sgt. Cronin and Lt. Moulder interviewed Detective Henry, another member of the Local 491 Executive Board.  Sgt. Cronin "asked Henry

AO 72A
(Rev.8/82)

if he had attended any meetings with Commissioner Bannister of the Gwinnett County Board of Commissioners," and whether "there was a specific movement to replace Chief Walters."[3]  (See Pl.'s St. of Mat. Facts [28-2] ¶ 57-58; Defs.' Resp. to Pl.'s Statement of Material Facts [36-11] ¶ 57-58.)

In December 2005, Sgt. Cronin submitted a written report to Chief Walters in which he identified two "policy violations" committed by Officer Fouchia: mutinous conduct and failure to support the department.  Despite Sgt. Cronin's finding, Chief Walters did not initiate any disciplinary action against Officer Fouchia.  During Chief Walters' tenure as Police Chief, no disciplinary charges have been filed against Officer Fouchia in relation to his statements and no adverse action has been taken against any officer for union-related activity or for wearing a police uniform without proper authorization.

## IV.    The Present Action

In February 2006, Officer Fouchia and Local 491 brought this action pursuant to 42 U.S.C. § 1983, claiming that the policy maintained by Chief

---

[3] Defendants admit that Sgt. Cronin and Lt. Moulder asked questions concerning the activity of Local 491 and their opinions on whether to replace Chief Walters' during their three interviews.  Neither party, however, provides great detail into what other questions were asked during the interviews.

10

Walters forbidding officers from wearing their uniform off duty while attending county commission meetings violates the First and Fourteenth Amendments to the United States Constitution.  Plaintiffs also claim that the questions asked of Sgt. Van Nus, Sgt. Jolly, and Det. Henry concerning their off-duty union activity violated Plaintiffs' speech and association rights protected under the First and Fourteenth Amendments.  Finally, Officer Fouchia claims that the failure of the Internal Affairs Department to provide him notice and an opportunity to respond to the inquiry initiated by Internal Affairs violated the Equal Protection Clause of the Fourteenth Amendment.  Both parties have since filed Motions for Summary Judgment.  Plaintiffs seek summary judgment only on their First Amendment claims; Defendants seek summary judgment on all claims, including Plaintiff Fouchia's Equal Protection claim.  The Court now takes up these Motions.

**Discussion**

**I.      Summary Judgment Standard**

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  FED.

11

R. Civ. P. 56(c).  The court should view the evidence and any inferences that

may be drawn from it in the light most favorable to the non-movant.  Adickes v.

S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142

(1970).  The party seeking summary judgment must first identify grounds that

show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett,

477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The burden

then shifts to the non-movant, who must go beyond the pleadings and present

affirmative evidence to show that a genuine issue of material fact does exist.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed.

2d 202 (1986).

## II.      Constitutionality of the Uniform Policy

Plaintiffs claim a right under the First Amendment to wear their county-

issued police uniforms while attending public meetings and speaking on matters

of public concern in their capacities as individuals and union members.  Relying

on Pickering v. Board of Education, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L.

Ed. 2d 811 (1968), and United States v. National Treasury Employees Union,

513 U.S. 454, 468, 115 S. Ct. 1003, 130 L. Ed. 2d 964 (1995) ("NTEU"),

Plaintiffs assert that the wearing of their uniform is itself a form of protected

12

expression that may not be restricted unless the government can prove an overriding interest in avoiding the "necessary impact of their expression on the actual operation of the Government." NTEU, 513 U.S. at 468.  Plaintiffs also argue that the inconvenience of having to change out of their uniform and into civilian clothes when attending public meetings between work shifts unduly burdens the exercise of their First Amendment rights.

Defendants respond that Plaintiffs have failed to demonstrate any First Amendment interest in wearing an official uniform and thus Pickering balancing is inappropriate.  Defendants contend that this case is instead controlled by the rational basis test applied by the Supreme Court to a law enforcement official dress regulation in Kelley v. Johnson, 425 U.S. 238, 247, 96 S. Ct. 1440, 47 L. Ed. 2d 708 (1976).  Even assuming a First Amendment interest, however, Defendants argue that Plaintiffs have failed to demonstrate that the state interest in maintaining official symbols of authority, the interest in maintaining discipline, and the interest in maintaining an appearance of official neutrality do not prevail.

For the reasons provided below, the Court concludes that Defendants' uniform policy, which the record reflects has been enforced evenhandedly and

13

in a content-neutral fashion, does not unconstitutionally abridge speech in violation of the First and Fourteenth Amendments.  Since Plaintiffs have offered no evidence that Defendants have instituted a viewpoint-selective policy, or otherwise allowed police officers to use the uniform as a means for individual expression while denying Plaintiffs a similar privilege, Defendants are entitled to summary judgment.

### A.    Incompatibility of **Pickering** Analysis

The Supreme Court has recently reiterated that "'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'"  Garcetti v. Ceballos, __ U.S. __, 126 S. Ct. 1951, 154 L. Ed. 2d 689 (2006) (quoting Connick v. Myers, 461 U.S. 138, 142, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)).  Where public employees "are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."  Id. at 1958.  But because a state has "interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general," the First Amendment requires "a balance between the interests of the

[employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568.

Illustrating this balance, the Supreme Court held in Pickering that a public school teacher could not be fired for publishing a letter in a local newspaper criticizing the local board of education's budgetary policies and public information methods. 391 U.S. at 563. Because the teacher was speaking on matters of "public concern," and her conduct did not interfere with the teacher's performance or the school's operation, the Court held that she could not suffer adverse consequences in her public employment solely on the basis of her critical public commentary. Id.; see also Givhan v. Western Line Consolidated School Dist., 439 U.S. 410, 417, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979) (holding a teacher could not be fired for privately communicating her concerns about racial discrimination in the school system to her employer because racial discrimination in the school system was a matter of public concern and employer did not demonstrate any negative consequence to the school's efficiency or employee's performance as a result of the plaintiff's speech).

15

On the other hand, speech primarily concerning a public employee's private interest is given little to no protection in the <u>Pickering</u> balance. In <u>Connick v. Meyers</u>, for example, the Court concluded that a city prosecutor could be fired for distributing questionnaires around the office concerning "office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns" because the questionnaires "reflect[ed] one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause celebre," and not a matter of public concern. <u>Id.</u> at 141, 148. Distinguishing the teacher's public statements concerning system-wide problems in <u>Pickering</u>, the Court held that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." <u>Id.</u> at 147.

Here, it is not clear that the act of wearing of uniform communicates a message of public concern. <u>See</u> <u>Shelby County Deputy Sheriffs' Ass'n v.</u>

AO 72A
(Rev.8/82)

<u>Gilless</u>, 67 F. App'x 860, 862-63 (6th Cir. 2003) (holding the wearing of a sheriff's uniform alone did not implicate any First Amendment interests). Nevertheless, the Court accepts for purposes of its analysis that there may be certain communicative or symbolic aspects in wearing a police uniform that implicate the protections of the First Amendment, including identifying the speaker as a police officer.  <u>See Latino Officers Ass'n, New York, Inc. v. City of New York</u>, 196 F.3d 458, 466 (2d Cir. 1999) (holding that wearing of police uniform at parade protesting police department policies had sufficiently communicative elements because "members of the public—specifically, the spectators at each of the parades—are more likely to discern and understand the LOA's message about discrimination and misconduct in the NYPD if plaintiffs wear uniforms"); <u>cf.</u> <u>Texas v. Johnson</u>, 491 U.S. 397, 404-05, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989) ("In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." (citing <u>Spence v. Washington</u>, 418 U.S. 405, 409-11, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974))).  Moreover, Defendants concede that

17

Officer Fouchia was speaking on matters of public concern in his appearances before the Gwinnett County Board of Commissioners.

Nevertheless, several considerations convince this Court that <u>Pickering</u> balancing, which would otherwise require the Court to consider on a case-by-case basis whether the denial of an exemption to Defendants' uniform policy necessarily prevented an adverse impact on the "actual operation of the Government," <u>see</u> <u>NTEU</u>, 513 U.S. at 468, is inapplicable to this case.  Rather, the Court concludes that this case is instead controlled by the more deferential analysis applied in <u>Schacht v. United States</u>, 398 U.S. 58, 90 S. Ct. 1555, 26 L. Ed. 2d 44 (1970), which upheld against a First Amendment challenge a criminal law banning the unauthorized wearing of a military uniform.

First, the constitutional protection afforded to Plaintiffs' off-duty conduct in wearing a police uniform is significantly diminished by the deference owed to rules regulating the conduct and appearance of law enforcement officers, which invoke "the core of the States' police power" to provide for the public safety.  <u>See</u> <u>Kelley v. Johnson</u>, 425 U.S. 238, 247, 96 S. Ct. 1440, 47 L. Ed. 2d 708 (1976).  In <u>Kelley</u>, the Supreme Court rejected a police officer's challenge to restrictions placed on his ability to wear facial hair, finding that it was

18

comfortably within the authority of the police department to condition its employment of police officers on a requirement that they remain clean-shaven. Id. at 248.  The Court declined to apply the Pickering balancing test, finding instead that the "[c]hoice of organization, dress, and equipment for law enforcement personnel is a decision entitled to the same sort of presumption of legislative validity as are state choices designed to promote other aims within the cognizance of the State's police power." Id. at 247.  Thus, rather than determining whether the shaving requirement advanced a "genuine public need," the Court applied the much more deferential rational basis test, requiring the police officer to prove that there was "no rational connection between the regulation, based as it is on the county's method of organizing its police force, and the promotion of safety of persons and property." Id.  Finding the regulation had "so clear" a rational basis that even a dismissal on the pleadings would have been proper, the Court reversed the court below and sustained the constitutionality of the regulation.  Id. at 249.

Here, Plaintiffs challenge a restriction that no less concerns "[c]hoice of organization, dress and equipment for law enforcement personnel" than the shaving rule at issue in Kelley.  See id. at 247.  That being said, the regulation

19

at issue here concerns off-duty and arguably expressive conduct, as opposed to the regulation at issue in <u>Kelley</u>, which concerned an asserted on-duty liberty interest in wearing facial hair.  But because the uniform policy is rooted in the core of the States' police power—that is, in its authority to maintain official uniforms to establish a police presence and ensure the public safety—it is owed a measure of deference not typically recognized in challenges by public employees to speech restrictions.

Second, unlike in the typical government employee speech case, Plaintiffs here do not challenge a disciplinary rule that directly restricts their speech based on its content or viewpoint.  Rather, in contrast to the plaintiffs in the <u>Pickering</u>-<u>Connick</u> line of cases, Plaintiffs here challenge a policy which regulates primarily *non-communicative* conduct—*i.e.*, the wearing of a police uniform and official symbols—and which only incidentally restricts, if at all, the symbolic expression of law enforcement officers.  <u>See</u> <u>United States v. O'Brien</u>, 391 U.S. 367, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968).

In <u>O'Brien</u>, the Supreme Court held that generally applicable laws which only incidentally restrict expressive conduct are accorded a lesser degree of scrutiny under the First Amendment than regulations which objectively target

20

speech.  391 U.S. at 371.  There, the plaintiff challenged a federal law

criminalizing the burning of military draft cards.  Id.  The Court began its

discussion by noting that the statute, at least on its face, did not directly abridge

speech because "there is nothing necessarily expressive about such conduct."

Id. at 375.  Even assuming that the statute reached expressive conduct

"sufficient to bring into play the First Amendment," however, the Court held

that "when 'speech' and 'nonspeech' elements are combined in the same course

of conduct, a sufficiently important governmental interest in regulating the

nonspeech element can justify incidental limitations on First Amendment

freedoms."  Id. at 377.  Thus, unlike the strict scrutiny typically applied to laws

which directly burden speech, the Court held that a regulation which primarily

targets non-communicative conduct "is sufficiently justified if it is within the

constitutional power of the Government; if it furthers an important or

substantial governmental interest; if the governmental interest is unrelated to

the suppression of free expression; and if the incidental restriction on alleged

First Amendment freedoms is no greater than is essential to the furtherance of

that interest."  Id. at 377.

21

Here, the rule challenged by Plaintiffs, like the regulation at issue in O'Brien, regulates primarily non-expressive conduct. The comprehensive ban on wearing the police uniform while off-duty, with only limited exceptions, at best only incidentally regulates expressive conduct. Thus, it faces a lesser degree of scrutiny than a government restriction which directly burdens speech.

Third, the implausibility of applying traditional balancing in this case is further demonstrated by the doubt concerning whether Plaintiffs challenge a condition of employment that abridges otherwise available speech rights in the first instance. In the public employee speech cases discussed above, and in Kelley, the Court all but assumed that the employee had the underlying *right*, as a free citizen, to speak in the manner which was later restricted as a condition of public employment. That is, the relevant analysis in those cases concerned whether the government could *condition* the public employment on the plaintiff's willingness to forfeit that *otherwise available* right. Thus, in Kelley, it was not doubted that the plaintiff, if he were not a police officer, would have had an underlying liberty interest in growing facial hair. And in Connick, despite eventually concluding that the First Amendment interests were outweighed by superior state interests, the Court never doubted that the plaintiff

22

had an underlying right, as a citizen, to question the management skills of the

local district attorney or inquire of others about their concerns regarding office

transfer policy.  Nor was it questioned in Pickering or Givhan whether the

employee had the right to criticize public school policies.

Unlike in those cases, however, Plaintiffs here assert a right that would

appear *not* to be otherwise available to the public at large: the right to adorn an

official police uniform.  In Georgia, in fact, it is a crime for members of the

public to do so without the explicit authority of the police department.  See

O.C.G.A. § 35-10-1 et seq; O.C.G.A. § 35-2-80 et seq.  Thus, Plaintiffs would

appear to challenge not the imposition of an employment condition, but rather

the denial of an employment *privilege*.

### B.      Uniform Policy is Constitutional under Schacht

Having considered the numerous incompatibilities of the case-by-case

Pickering analysis with this case, the Court concludes that Pickering does not

provide the appropriate framework in which to analyze the challenged uniform

policy.  Rather, this case is controlled by Schacht v. United States, 398 U.S. 58,

90 S. Ct. 1555, 26 L. Ed. 2d 44 (1970), in which the Supreme Court applied a

more deferential analysis to restrictions placed on private use of an official

uniform.

In <u>Schacht</u>, the plaintiff challenged two federal laws, one criminalizing

the unauthorized wearing of a military uniform, and one creating a limited

exception allowing individuals to wear a military uniform in a "theatrical

production" as long as the production did not "tend to discredit" the military.

<u>Id.</u> at 60 (citing 18 U.S.C. § 702).  Addressing the former, the Supreme Court

with little discussion held that it was "clear that . . . making it an offense to wear

our military uniforms without authority is, standing alone, a valid statute on its

face."  <u>Id.</u> at 61.  But the Court held that the second law which created the

"actor's exception" could not withstand First Amendment scrutiny.  Since it

discriminated on the basis of the content of the actor's performance, and "in

effect made it a crime for an actor wearing a military uniform to say things

during his performance critical of the conduct or policies of the Armed Forces,"

the exception violated the First Amendment.  <u>Id.</u> at 62-63.

In upholding the general ban on the unauthorized use of the uniform,

<u>Schacht</u> emphasized the special deference owed to military regulations.  But in

this Court's view, the decision reached in <u>Schact</u> is no less certain in the context

of paramilitary law enforcement organizations.  While the Supreme Court's "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society," Goldman v. Weinberger, 475 U.S. 503, 507, 106 S. Ct. 1310, 89 L. Ed. 2d 478 (1986), courts have recognized the state interest in maintaining control over its official uniforms is no less compelling in the context of law enforcement.  See, e.g., Shelby County Deputy Sheriffs' Ass'n v. Gilless, 67 F. App'x 860, 862-63 (6th Cir. 2003) (recognizing similarity in concerns of military and law enforcement); cf. I.N.S. v. Federal Labor Relations Auth., 855 F.2d 1454, 1466 (9th Cir. 1988) (upholding restriction on wearing of union adornments by INS officials and applying reasoning of Goldman).

Recognizing that a government has a compelling interest in maintaining tight control over its official symbols of authority, Schacht instructs that governments may generally ban unauthorized use of its uniform, as long as it does so in a content-neutral and generally-applicable manner.  But where it takes the additional step of granting certain individuals the privilege to use its official symbol in an expressive manner—thereby creating a protectable First Amendment interest where none previously existed—the governing authority

25

may not then, absent a compelling reason, deny others a similar privilege on the basis of the content of their expression.  See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983); Cook v. Gwinnett County School Dist., 414 F.3d 1313, 1321 (11th Cir. 2005) (holding that refusal to allow public school bus driver to use internal mail system and employee paycheck envelopes for union solicitation purposes, while it would not normally implicate First Amendment concerns, violated the First Amendment because others were allowed a similar privilege); Searcey v. Harris, 888 F.2d 1314, 1324-25 (11th Cir. 1989) (concluding that, once public school allowed military access to school on career day, it had to allow other organizations critical of military service).[4]  In upholding the general ban on wearing military uniforms but striking the actor's exception, Schacht reflects this crucial—and almost always determinative—constitutional distinction.

Applying those guideposts to the present case, the Court readily concludes that Defendants' uniform policy is constitutional under the First

---

[4] The determination may thus be aptly described to turn on whether the state has created a "limited public forum" for expression in its official symbols of authority such that others expressing views on a similar subject matter may not be discriminated against on the basis of viewpoint.  See Perry, 460 U.S. at 45.

Amendment.  As recognized in <u>Schact</u>, the Gwinnett County Police Department has significant interests in maintaining tight control over its official symbols of authority.  <u>See</u> <u>Schact</u>, 398 U.S. at 60.  It also has significant interests in preserving "discipline, esprit de corps, and uniformity" in its police force, <u>see</u> <u>Kelley</u>, 425 U.S. at 246, and in manifesting official neutrality by "avoiding the appearance of partisanship or partiality," <u>see</u> <u>Belch v. Jefferson County</u>, 108 F. Supp. 2d 143, 148 (N.D.N.Y. 2000).  Each of these interests has its foundation in the core police power to provide for the public safety.  In view of these important state interests, and because, as explained above, Plaintiff's challenge differs significantly from a typical challenge by a public employee to a content-based adverse action, Defendants' uniform policy, as a generally applicable rule concerning the wearing of an official uniform by law enforcement and which is aimed at principally non-communicative conduct, is facially constitutional.  <u>See</u> <u>Schact</u>, 398 U.S. at 63.

Moreover, the uniform policy is constitutional as applied in this case. The record is undisputed that the uniform policy is enforced by Chief Walters in a general and content-neutral manner.  Plaintiffs have introduced no evidence that Chief Walters ever allowed other members of the Gwinnett County Police

27

Department to wear their uniforms for individual expressive purposes. The Gwinnett County Police Department has not created a limited exception for individual expression in its official police uniform similar to the actor's exception found unconstitutional in Schact. Rather, Chief Walters maintains a general ban allowing no exceptions for individual expressive purposes.

### C.    Plaintiffs' Reliance on Latino Officers is Unavailing

It is for that reason that Plaintiffs' reliance on Latino Officers Ass'n, New York, Inc. v. City of New York, 196 F.3d 458, 462-63 (2d Cir. 1999), is misplaced. In Latino Officers, the Second Circuit struck down a police uniform policy which had authorized certain political associations to march off-duty in their police uniforms but denied others a similar privilege. Id. Although the court determined at the outset that the uniform policy should be analyzed under the exacting scrutiny applied in United States v. Nat'l Treasury Employees Union, 513 U.S. 454, 468, 115 S. Ct. 1003, 130 L. Ed. 2d 964 (1995) (requiring government to show that plaintiffs' interests and the interests of plaintiffs' potential audiences are outweighed by the expression's "necessary impact on the actual operation of the Government"), a conclusion in tension with this Court's own understanding, the court in Latino Officers nevertheless

28

emphasized that it was the "improperly selective policy," and not the underlying right to wear a police uniform, that raised serious constitutional doubt.  Id. at 465.

Citing Schacht, the court in Latino Officers recognized that a police department "may be constitutionally permitted to prohibit all fraternal organizations from marching in uniform."  196 F.3d at 468; see also id. at 465 (stating that "[i]t is undisputedly true that the NYPD has a strong interest in maintaining control over how its uniform and symbols are used," and "prohibiting the unauthorized wearing of a police uniform prevents improper exercise of the powers granted to police officers and exploitation of the trust that wearing a police uniform is meant to inspire," but that "it does not follow from this premise that defendants have seemingly lesser included authority to ban only some organizations from marching in uniform").  But where exceptions are provided for individual expressive purposes, the Court noted, that  "selectivity must itself pass constitutional muster."  Id. (citing City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 425-28, 113 S. Ct. 1505, 123 L. Ed. 2d 99 (1993)).  It went on:

29

> [D]efendants' interest in controlling the use of
> the NYPD uniform does not support the specific
> restriction at issue here—namely, the prohibition on
> plaintiffs' marching in uniform behind their
> organizational banner in an ethnic pride parade when
> similarly situated organizations are allowed to march
> in such a manner. Whether or not defendants could
> constitutionally prohibit all fraternal organizations
> from marching in uniform—an issue we need not, and
> do not, decide—the fact of the matter is that the
> NYPD already permits at least 25 such organizations
> to march in uniform.  Having allowed these
> organizations to use the NYPD uniform in such a
> manner over many decades, the NYPD cannot now
> deny plaintiffs the same privilege without
> demonstrating that their use of the uniform is both
> distinguishable from that of the various authorized
> organizations and "so threatening to the efficiency of
> the [NYPD] as to render the [restriction] a reasonable
> response to the threat."

Id. at 467 (quoting NTEU, 513 U.S. at 473).

In contrast to both the actor's exception in Schact and the parade policy in Latino Officers, here there is no evidence in the record that Defendants either authorized police officers to wear their uniforms for expressive purposes, or otherwise enforced a "selective policy" allowing such use in some cases and not others.  Rather, this case addresses the precise question which Latino Officers

30

emphasized it was not addressing:  whether a police department can

constitutionally ban *all* officers from using the uniform for expressive purposes.

That question was, however, addressed in <u>Belch v. Jefferson County</u>, 108

F. Supp. 2d 143 (N.D.N.Y. 2000), which reached a similar conclusion as the

Court does here.  In <u>Belch</u>, a police officer and president of a sheriff's

association challenged disciplinary action taken against him for appearing on

television while on-duty and in uniform, and during the appearance endorsing

candidates for a local election on behalf on the sheriff's association.  <u>Id.</u>  The

Sheriff disciplined the plaintiff as result of his violation of a disciplinary rule

banning officers from appearing on radio or television "while holding

themselves out as having an official capacity in such matter, without the

approval of the Sheriff."  <u>Id.</u> at 146-47.  Rejecting the plaintiff's First

Amendment challenge, the court reasoned that the rule "only proscribes officers

from making public statements in a manner that makes it appear as though the

statements have the official backing of the Sheriff's Department," and "leaves

the officers . . . alternative means of public expression."  <u>Id.</u>  Thus, on its face,

the rule did not violate the First Amendment.  The court found that the

"significant interest police departments have in maintaining 'discipline, espirit

[sic] de corps, and uniformity,'" and "the recognized interest in avoiding the appearance of partisanship or partiality" overcame any incidental burden on the plaintiff's speech rights.  Id. (citations omitted).

Returning to the policy at issue in this case, it is clear that the absence of any evidence of selective enforcement or content-based exemptions renders the this case closely akin to Belch and distinguishable from Latino Officers. Inasmuch as it does so indiscriminately, the First Amendment does not forbid a government from jealously protecting and zealously restricting the use of its uniforms for non-official purposes.

### D.    Plaintiff's Other Arguments Similarly Fail.

Morever, despite Plaintiff's arguments to the contrary, the inconvenience a police officer may suffer in being required to change out of his uniform before attending meetings of the county commission does not call into question the constitutionality of the Gwinnett County uniform policy.  While it may be "easier for a police officer to stop and shop at Kroger than to attend a BOC meeting," (see Pl.'s Br. in Supp. of Mot. for Summ. J. [28-3] at 6.), or to perform other routine errands incidental to the work commute, such a restriction cannot be said to be a "significant burden," a "wholesale deterrent to a broad

32

category of expression by a massive number of potential speakers," or a "sweeping statutory impediment" to speech by public employees of the sort that would raise serious constitutional concerns.  See NTEU, 513 U.S. at 467-68.

Nor is the policy called into question by any individual interest of Plaintiffs in personally expressing the message inherent in the wearing of the police uniform at public meetings.  Any such personal interest fatally collides with the superior public interest in restricting the use of official symbols to official purposes and maintaining the appearance of governmental neutrality. Indeed, "allowing police officers to speak publicly on partisan political matters while appearing to have the official support of the department leads to both internal unrest and public relations problems," a consequence far worse than the inconvenience of not being allowed to speak with the authority of the uniform. Belch, 108 F. Supp. 2d at 148.

Plaintiffs have ample alternative means to express the message they seek to convey with the uniform at meetings of the Gwinnett County Board of Commissioners.  Plaintiffs remain free to attend meetings of the Gwinnett County Board of Commissioners and remain free to speak on issues of public

33

concern.  The undisputed evidence also reflects that they are free to identify

themselves as police officers when speaking at public meetings.

      Finally, the fact that the uniform policy was not previously enforced

against Officer Fouchia prior to Defendant Walters's tenure as Chief of Police

Chief has little bearing on the Plaintiff's challenge of the presently content-

neutral and generally enforced policy.  A police chief is not necessarily bound

by the judgments of his predecessor, and is free to institute or enforce

constitutional restrictions on public employees that have not been previously

enforced.   Even assuming, however, that Chief Walters' predecessor allowed

the police uniform to be used for a limited forum for personal expression, as did

the police department in <u>Latino Officers</u>, Chief Walters could lawfully

eliminate that limited public forum in order to further the interests of the police

department and in a manner consistent with the First Amendment.  <u>See</u> <u>Gregoire</u>

<u>v. Centennial School Dist.</u>, 907 F.2d 1366, 1370 (3d Cir. 1990) ("A state is not

required to maintain the open character of the facility indefinitely."(citing <u>Perry</u>,

460 U.S. at 46)).  Plaintiffs do not allege that Chief Walters enforced the policy

to retaliate against Officer Fouchia for the content of his speech.  Absent

evidence to the contrary, there is no violation of the First Amendment.

34

**E.      Conclusion**

In short, the Court concludes that, because the uniform policy furthers the state interest in public safety and does not directly regulate expressive conduct, it is constitutional on its face.  Because Plaintiffs have failed to demonstrate arbitrariness, or enforcement of a "selective policy" of the sort that was found unconstitutional by the Supreme Court in <u>Schact</u> or by the Second Circuit in <u>Latino Officers Ass'n</u>, it is also constitutional as-applied in this case.

Plaintiffs have failed to come forth with facts sufficient to demonstrate a First Amendment violation concerning Defendants' uniform policy.  Insofar as the parties seek judgment as a matter of law on that issue, Defendants' Motion for Summary Judgment is **GRANTED**, and Plaintiffs' Motion for Summary Judgment is **DENIED**.

**III.    Constitutionality of the Inquiries Concerning Police Officers' Off-Duty Union Activity**

The remaining claims in this case concern the inquiry conducted by Internal Affairs investigators regarding allegedly "mutinous" statements made by Officer Fouchia while on duty.

### A.      Freedom of Association Challenge

Local 491 claims that the questioning by Sgt. Cronin and Lt. Moulder of members of Local 491 concerning their off-duty union activity under threat of discipline violates the First Amendment, and seek declaratory and injunctive relief.

### 1.      Standing of Local 491

As an initial matter, the Court must determine whether Local 491 has standing to sue on behalf of its members.  Although Defendants do not challenge the standing of Local 491, "[a] plaintiff does not acquire standing merely because the defendant raises no objection." Church of Scientology Flag Service Org., Inc. v. City of Clearwater, 777 F.2d 598, 606 (11th Cir. 1985); see also Region 9 Forest Serv. Timber Purchasers Council v. Alcock, 993 F.2d 800, 807 & n.9 (11th Cir. 1993) (raising issue of organizational standing *sua sponte* and for first time on appeal).

A voluntary association has standing to sue on behalf of its members when the following elements are present: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the

relief requested requires the participation of individual members in the lawsuit. Hunt v. Washington State Apple Adv. Comm'n, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977).

Local 491 has met the first prong required of associational standing.   The individuals subject to the Internal Affairs inquiry would otherwise have standing to sue in their own right because they have suffered an alleged constitutional injury.  As to the second prong, Local 491 sues alleging governmental interference with its private affairs, and it cannot be doubted that the protection of association rights and union activities are germane to the organization's purpose.  See Nat'l Assocc for Advancement of Colored People v. Alabama, 357 U.S. 449, 462, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958).  And as to the final prong, Local 491 seeks solely declaratory and injunctive relief, and the facts are undisputed that several members of Local 491 were required to answer questions concerning their off-duty union activities.  The participation of individual members of the organization is thus not required for the claim asserted or for the relief requested.  See Self-Insurance Institute of Am. v. Korioth, 53 F.3d 694, 695-96 (5th Cir. 1995) ("Though an association may have standing to seek a 'declaration, injunction, or some other form of prospective

37

relief' on behalf of its members, it does not enjoy standing to seek damages for monetary injuries peculiar to individual members where the fact and extent of injury will require individualized proof." (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 515, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975))); <u>Retired Chicago Police Ass'n v. City of Chicago</u>, 7 F.3d 584, 602-03 (7th Cir. 1993) (noting that third prong of <u>Hunt</u> depends largely on the relief sought); <u>Warth</u>, 422 U.S. at 515 ("[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought.").

Accordingly, the Court concludes Local 491 has standing in this case to assert the associational rights of its members.[5]

        2.    <u>Standard Applicable to Plaintiff's Freedom of Association Challenge</u>

Unlike Plaintiffs' challenge to the uniform policy, Plaintiffs' second claim is controlled by the now familiar principles applicable to challenges to public employee speech restrictions.  In viewing the constitutionality of the

---

[5] As the Court concludes below, however, Local 491 does not have standing to pursue injunctive relief because it has failed to demonstrate an ongoing violation or threat of immediate harm.

38

investigatory practice challenged here, the Court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[6] <u>Pickering</u>, 391 U.S. at 568.

The Court begins by considering the First Amendment interests of Local 491 and its members.  It is well established that the right of association assured by the First Amendment protects a public employee's right to associate with a union.  <u>See</u> <u>Roberts v. United States Jaycees</u>, 468 U.S. 609, 618, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984); <u>Cook v. Gwinnett County School Dist.</u>, 414 F.3d 1313, 1320 (11th Cir. 2005); <u>Hitt v. Connell</u>, 301 F.3d 240, 245 (5th Cir. 2002).  Moreover, associational activity by public employees is protected under the First Amendment without a showing that it relates to a matter of public concern.  <u>See</u> <u>Cook</u>, 414 F.3d at 1320 ("In analyzing free association claims . . . we do not apply the public concern portion of the <u>Pickering</u> analysis."); <u>Hatcher v. Bd. of Public. Educ. and Orphanage for Bibb County</u>, 809 F.2d 1546, 1558

---

[6] As Plaintiffs concede, no adverse employment action has been alleged here. Nevertheless, as the Court concludes below, the chilling effect that results from compelled disclosure of associational activity requires the Court to scrutinize the challenged governmental action to at least as great a degree as in the typical <u>Pickering</u> challenge to an adverse employment action.

AO 72A
(Rev.8/82)

(11th Cir. 1987) (holding that the public concern requirement is "inapplicable to freedom of association claims"); Ross v. Clayton County, 173 F.3d 1305, 1310-11 (11th Cir. 1999) (applying Pickering balancing test to freedom of association claim without considering public concern); cf. Beach v. City of Olathe, 185 F. Supp. 2d 1229 (D. Kan. 2002) (holding that, regardless of applicability of public concern requirement, police officer's union activity touched upon matters of public concern).  It is also no less protected simply because an individual "chose to add the support of her silent presence to the efforts of those who took a more active role."  Hatcher, 809 F.2d at 1558.

The right of association protects confidentiality in one's private, civic, and political associations, particularly where government intrusion may result in a chilling effect on collective action.  See Nat'l Assocc for Advancement of Colored People v. Alabama, 357 U.S. 449, 462, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958) ("NAACP").  In NAACP, the Supreme Court held that Alabama could not subpoena membership lists of the NAACP in connection with an investigation regarding its compliance with corporate registration laws because such disclosure would likely adversely affect the NAACP and its members' ability to "pursue their collective effort to foster beliefs which they admittedly

have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." Id. at 463. "Inviolability of privacy in group association," the Court explained, "may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." Id. at 462. After finding that the plaintiffs had made an "uncontroverted showing" that the subpoena of membership lists would "entail[] the likelihood of a substantial restraint" on their freedom of association, the Court held that the burden shifted to the defendants to show that it had a substantial state interest in ascertaining the information and that its subpoena was "narrowly tailored to that interest." Id. Because Alabama failed to demonstrate that it had a substantial interest in ascertaining the names of all members of the NAACP in furtherance of its investigation, the Court held that the individual right to association outweighed the state's interest in compelling disclosure and reversed the state court's contempt order. Id. at 464-65.

The protections afforded to associational activity and recognized in NAACP extend to organizations of police officers. See Beach, 185 F. Supp. 2d

at 1238 (concluding that police officer who was regularly attending city council meetings on behalf of Fraternal Order Of Police engaged in protected associational activities).  Moreover, the Eleventh Circuit has recognized that a police officer, like other public employees, "has a legitimate interest in maintaining a zone of privacy where he can speak about work without fear of censure."  Waters v. Chaffin, 684 F.2d 833, 837 (11th Cir. 1982).  In Waters, a police officer, who was disciplined by the police department as a result of making several derogatory comments about the acting local police chief while off-duty and drinking at a bar, sued to challenge the disciplinary action.  Id. Although the court recognized that the department had a substantial interest in developing discipline, esprit de corps, and uniformity to promote the public safety, the court held that the police department had not demonstrated actual harm or a reasonable likelihood of harm to its efficiency, discipline, or harmony such that the employee's off-duty speech could form the basis of the government's disciplinary action.  Id. at 840.  It explained:

> We do not doubt that the department may restrict the
> actions of its off-duty officers in many ways, but it
> does not follow that these off-duty restrictions may
> unnecessarily impinge upon private, social
> conversation.  Absent significant countervailing

> governmental interests, we are loathe to sanction the
> intrusion of the government's ear into the private lives
> of its employees.

Id. at 838-39.

The right to privacy in a public safety officer's off-duty personal affairs was also considered in Hester v. City of Milledgeville, 777 F.2d 1492, 1496-97 (11th Cir. 1985), which upheld certain aspects of a condition requiring firefighters to undergo a polygraph examination.  There, a firefighter challenged the constitutionality of several "control questions" asked in connection with a polygraph examination, which were "designed to evoke a deceptive or nervous response from everyone tested."  Id. at 1496-97.  The questions asked whether the firefighters "had ever done anything which, if discovered, would have resulted in their dismissal or would have discredited the department."  Id. at 1497.  Balancing the right to privacy and the "individual interest in avoiding disclosure of personal matters" against the state's interest in the polygraph examination, the court held that the interest in ensuring the reliability of polygraph testing, "especially since the testing was directed toward improving the public's safety by ferreting out drug problems in the fire department," outweighed the individual's privacy interests and thus rendered the questions

AO 72A
(Rev.8/82)

constitutional.  But the court emphasized that the questions were proper because they were asked for "a specific, limited purpose," and avoided questions of a more personal nature:

> We emphasize proper use. We would have reservations if the city or any governmental unit were to use a subject's response to a control question for any purpose other than comparing the polygraph reading for the control question to the same subject's reaction to a relevant question.  There is, however, no indication that the city plans to take disciplinary actions based on the control questions, release the responses to the public, or even make the responses a part of the subjects' employment records.  We also note that there might well be a point at which a control question is so embarrassing or specific, or concerns so personal a matter, as to render the question unconstitutional even when asked for a proper purpose.  That point, however, has not yet been reached here.

Id. at 1497.

Other cases have similarly addressed the privacy protections deriving from the freedom of association afforded to public employees in off-duty activity.  See Wilson v. Taylor, 658 F.2d 1021, 1024 (11th Cir. 1981) (finding that right to association protected police officer from suffering adverse action for romantic relationship with felon's daughter); Thorne v. City of El Segundo,

44

726 F.2d 459, 469-70 (9th Cir. 1983) (holding that police department inquiry

burdening employment applicant's privacy and free association rights must be

evaluated under "heightened scrutiny" and thus be "narrowly tailored" to police

department's "legitimate interests").

There are, however, strong opposing state interests that must be weighed

against Plaintiffs' First Amendment interests.  "In a law enforcement agency,

there is a heightened need for order, loyalty, morale and harmony, which

affords a police department more latitude in responding to the speech of its

officers than other government employers."  Oladeinde v. City of Birmingham,

230 F.3d 1275, 1293 (11th Cir. 2000).  The Eleventh Circuit has noted that

"comments concerning co-workers performance of their duties and superior

officers' integrity can directly interfere with the confidentiality, esprit de corps

and efficient operation of the police department."  Busby v. City of Orlando,

931 F.2d 764, 774 (11th Cir. 1991) (citations and quotations omitted).

Moreover, "'[d]iscipline is a necessary component of a smoothly-operating

police force . . . [and] must be maintained among police officers during periods

of active duty.'"  Id. (quoting Williams v. Board of Regents, 629 F.2d 993,

1003 (5th Cir. 1980)).  Thus, "courts should consider and give weight to the

45

need for maintaining a close working relationship in quasi-military

organizations like police departments." <u>Id.</u> (citing <u>Saye v. Williams</u>, 452 U.S.

926, 929, 101 S. Ct. 3063, 3065, 69 L. Ed. 2d 428 (1981) (Rehnquist, J.,

dissenting from denial of certiorari)).  All of these considerations have led the

Eleventh Circuit to conclude that "a reasonable likelihood of harm generally is .

. . enough to support full consideration of the police department's asserted

interests in restricting its employees' speech.'" <u>McMullen v. Carson</u>, 754 F.2d

936, 940 (11th Cir. 1985) (quoting <u>Waters</u>, 684 F.2d at 839 n.12)).

     Recognizing the importance of loyalty and discipline within the ranks of

law enforcement, the Eleventh Circuit held in <u>Busby</u> that a police chief had

qualified immunity because a policy requiring a police officer to delay publicly

disclosing acts of malfeasance within the police department until after such

allegations were investigated internally was not clearly unconstitutional.  931

F.2d at 774-75.  Then again in <u>Oladeinde</u>, the court held that police officers

could, consistent with the First Amendment, be required to disclose allegations

of misconduct against other officers to the internal affairs department before

disclosing those allegations to the public because of the department's interests

in maintaining order, loyalty, morale, and harmony. 230 F.3d at 1294.  A

dismissal based on a violation of that rule, regardless of the First Amendment

interest in not delaying public disclosure of malfeasance by public officials, was

held constitutional in Oladeinde.  Id.

In addition to a police department's interests in loyalty, discipline, and

internal order, the Eleventh Circuit has recognized that there are also strong

external interests, including maintaining public confidence in law enforcement

agencies, that may be considered in the Pickering balance.  See, e.g., Anderson

v. Burke County, 239 F.3d 1216, 1222 (11th Cir. 2001) (accepting the

maintenance of public confidence in the ability of a fire department to carry out

its mission as compelling and legitimate interest and holding that it outweighed

plaintiff's interest in distributing questionnaires to candidates for local election

concerning employment policies); Shahar v. Bowers, 114 F.3d 1097, 1109

(11th Cir. 1997) (noting "the significance of public perception when law

enforcement is involved").

In McMullen, for example, the Eleventh Circuit held that a police officer

could be fired for his outspoken role in the Ku Klux Klan.  It reasoned that "a

law enforcement agency does not violate the First Amendment by discharging

an employee whose active participation in an organization with a history of

violent activity, which is antithetical to enforcement of the laws by state officers, has become known to the public and created an understandably adverse public reaction that seriously and dangerously threatens to cripple the ability of the law enforcement agency to perform effectively its public duties."  754 F.2d at 940.

And in a case more factually similar to the present case, and on which Defendants heavily rely, the Eleventh Circuit held in Brochu v. City of Riviera Beach, 304 F.3d 1144, 1161 (11th Cir. 2002), that a police officer who was terminated as a result of publicly exposing his plan to "overthrow" the police chief and, with the help of several newly elected city commissioners, install himself as the replacement, could be constitutionally terminated under the First Amendment for disrupting the daily activities of the police department.  Id. Noting the importance of maintaining stability and public confidence in police departments, the Court reasoned that "Brochu crossed the line when he went beyond political activity as a citizen and created a secret plan, as an employee, to overthrow his superiors and then *shared* that plan with a few civilians in the community, actually enlisting their assistance in effectuating the 'coup.'" Id. at 1160 (emphasis in original).  Although the court recognized Brochu had First

Amendment interests in lobbying the city council, supporting political

candidates, and even publicly criticizing the acting police chief, he could not,

the court reasoned, "permanently insulate [himself] from a

legitimately-motivated adverse employment action by simply becoming

politically active and thereafter artificially linking all [his] behavior to that

allegedly protected political activity." Id. at 1161.  Thus, it concluded:

> Brochu's mistake was in causing a furor in the
> community by publicly disseminating the plan (or at
> least in not preventing its public dissemination),
> compromising the ability of [the police chief] and the
> entire police department to function effectively. Not
> only did this go beyond "a citizen . . . commenting
> upon matters of public concern," Pickering, 391 U.S.
> at 568, 88 S. Ct. 1731, it actually threatened the
> effectiveness of the safety forces, notwithstanding the
> fact that the plan which Brochu allowed to be leaked
> happened to target Poreba himself.

Id. at 1160.

Despite their emphasis on Brochu, however, Defendants do not advance

the external interest in maintaining public confidence in the Gwinnett County

Police Department in defending the constitutionality of their inquiries of Sgt.

Van Nus, Sgt. Jolly, and Det. Henry.  Indeed, no evidence in the record suggests

that there was any "public uproar," "furor in the community," or even

49

anticipation of any such uproar as a result of Officer Fouchia's statements

regarding his efforts to replace the police chief.  Indeed, it is unclear from the

record whether anyone outside of the department (other than a member of the

Gwinnett County Board of Commissioners) was ever made aware of Officer

Fouchia's efforts to interview replacements to Chief Walters.  The evidence

suggests only that Officer Jenkins, and later Assistant Chief Bruno, Chief

Walters, and the two Internal Affairs investigators, were aware of those efforts.

Simply stated, the interest in staving off public uproar and maintaining public

confidence in law enforcement noted in Brochu and McMullen are of limited

significance in this case, and thus are accorded little if any weight in the

Pickering balance.

    Moreover, while Brochu might arguably compel the conclusion that

*Officer Fouchia* had no First Amendment protection of the statements he made

on-duty concerning his efforts to replace Chief Walters, it is not the

constitutional interests of Officer Fouchia with which the Court is concerned.

The Court must instead balance the interests of Local 491 and the officers who

were interrogated against the state's asserted interests.

3. <u>Application of Pickering to Plaintiff's Challenge</u>

Having focused the Court's inquiry on the relevant interests asserted and evidenced in this case, the Court turns to examine the constitutionality of the Internal Affairs' inquiries.

As an initial matter, the Court does not question that Defendants had a significant interest in initiating the inquiry into whether Officer Fouchia in fact made "mutinous" statements on duty concerning the replacement of the current police chief.  Without expressing any opinion on the merits of the inquiry, it is clear that, in general, statements made on duty which may reasonably be anticipated to compromise the ability of the police chief and the entire police department to function effectively may be grounds for a valid inquiry or an adverse employment action.  <u>Brochu</u>, 304 F.3d at 1160.

But Plaintiffs do not challenge the propriety of the decision to investigate Officer's Fouchia's on-duty statements.  Rather, the question presented here is whether, when conducting an inquiry to determine whether a police officer made allegedly mutinous on-duty statements, a police department may question, under threat of discipline, other officers who are not subjects of the inquiry about their off-duty collective activities and private political efforts, when the

51

admitted "sole purpose of the inquiry," according to Defendants, "was simply to

determine if a police officer engaged in on-duty conduct which rose to the level

of a violation" of the code of conduct.  (See Defs.' Resp. to Pls.' Mot. for

Summ. J. [36-2] at 10.)

 In defending the questioning of Sgt. Van Nus, Sgt. Jolly, and Det. Henry,

Defendants argue that, by examining the nature of Officer Fouchia's off-duty

political and union activities, they sought to obtain "context" to Officer

Fouchia's allegedly mutinous on-duty statements.  They explain as follows:

> Fouchia was reported by Jenkins to have referenced
> the union in some of his statements to Cronin,
> Moulder, and Bruno.  Accordingly, when Cronin was
> assigned to the case, he felt it was important to
> determine whether Fouchia was repeating a political
> agenda advanced by a private organization or
> whether, acting individually, Fouchia was actively
> advocating the overthrow of the Police Chief. As an
> experienced investigator, Cronin was reasonably
> trying to put Fouchia's statements in some sort of
> context.  Originating, creating, inciting, causing, or
> otherwise joining any mutinous or seditious
> movement within the department is a violation of [the
> General Directives Manual] . . . . However, Cronin
> also recognized that the union may have a political
> agenda which advocated for a 'change in Chief.'
> Statements of this nature may not have violated any
> departmental policy.  While there may have been a
> gray area between protected advocacy and mutinous

> conduct, and union involvement may not, at some
> point have excused Fouchia's on-duty statements,
> Cronin acted reasonably to put his alleged behavior in
> context.

(See Defs.' Resp. to Pls.' Mot. for Summ. J. [36-2] at 12-13.)

As the Court understands it, Defendants thus offer the following legal proposition:  In the course of investigating alleged on-duty disloyalty, a police department may reasonably compel disclosure of the off-duty protected activity of other officers with whom the subject of the investigation was known to associate in order to determine whether his on-duty activity should be disciplined.  But in this case, the First Amendment required greater sensitivity to the associational, speech, and confidentiality interests of Local 491, particularly in view of the apparently tangential relevance to Officer Fouchia's off-duty conduct to the investigation of which *statements* he made while on duty.  The Court therefore disagrees with Defendants' contention.

As the Supreme Court has stated, "it is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition that the State convincingly show a substantial relation between the information sought and a

53

subject of overriding and compelling state interest."  Gibson v. Florida

Legislative Investigation Committee, 372 U.S. 539, 83 S. Ct. 889, 9 L. Ed. 2d

929 (1963); see also Fraternal Order of Police, Lodge No. 5 v. City of

Philadelphia, 812 F.2d 105, 119 (3d Cir. 1987) (questions regarding

memberships in political organizations "can be justified only when the interests

of the state survive exacting scrutiny and when there is a relevant correlation or

substantial relation between the governmental interest and the information

required to be disclosed" (quoting Buckley v. Valeo, 424 U.S. 1, 64, 96 S. Ct.

612, 656, 46 L. Ed. 2d 659 (1976)); cf. Shelton v. Tucker, 364 U.S. 479, 81 S.

Ct. 247, 5 L. Ed. 2d 231 (1960) (questions must be "justified in the exercise of

the State's legitimate inquiry into the fitness and competency" of its

employees).  Where officers are questioned as a part of a mandatory

disciplinary inquiry concerning their off-duty protected activities, the questions

asked must thus "specifically, directly, and narrowly relate" to a legitimate

inquiry and be no more intrusive than reasonably necessary to the inquiry to

survive First Amendment scrutiny.  See Michigan State Police Troopers Ass'n,

Inc. v. Hough, 872 F.2d 1026 (6th Cir. 1989) (table), at *3 (citing O'Brien v.

DiGrazia, 544 F.2d 543, 546 (1st Cir. 1976); Fraternal Order of Police, 812

54

F.2d at 119 (concluding that questionnaire distributed to applicants for special investigations unit in police department which requested disclosure of all political associations violated First Amendment).

Here, by asking questions about whether the leaders of Local 491, in the course of their organizational participation, had expressed opinions concerning the replacement of the current police chief, and by asking whether they had engaged in communications with members of the Gwinnett County Board of Commissioners, Internal Affairs investigators intruded into quintessentially protected associational activity.  Although the questions were asked in connection with a legitimate inquiry into Officer Fouchia's on-duty conduct, it is not clear how, in determining whether disloyal statements were made on duty, it was relevant—much less necessary— for the Internal Affairs investigators to determine whether similar statements had been made off duty in connection with protected union activity.  In view of the admittedly discrete objective of the investigation, the "sole purpose" of which, Defendants concede, was to determine whether Officer Fouchia made on-duty mutinous statements, the Court is not convinced that the desire to "put Fouchia's statements in some sort of context" necessitated governmental intrusion into the private affairs and

political agendas of police officers with whom Officer Fouchia was known to be organizationally affiliated.  Because these questions did not specifically, directly, and narrowly relate to the legitimate inquiry initiated into Officer Fouchia's on-duty conduct, Local 491's First Amendment interests in the confidentiality of their associational activities outweighed the state interest in compelled disclosure.  The <u>Pickering</u> balance weighs in favor of Local 491, and Plaintiffs have thus demonstrated a First Amendment violation.

       4.    <u>Proof of Chilling Effect</u>

Defendants' argue that Plaintiffs have failed to introduce evidence of a chilling effect, which is required to maintain a First Amendment claim.  There is some uncertainty regarding the extent of evidence required to sustain a First Amendment challenge based on the chilling effect of compelled disclosure of protected political activity.  <u>See</u> <u>In re Grand Jury Proceeding</u>, 842 F.2d 1229, 1235-36 (11th Cir. 1988).  The Supreme Court has indicated on several occasions that some evidence of a chilling effect is required.

In <u>NAACP</u>, for example, the Supreme Court accepted that a chilling effect would result from the compelled disclosure of the NAACP's membership lists because of "uncontroverted evidence" in the record that members of the

NAACP had suffered past adversity as a result of their known membership in the group.  357 U.S. at 464-65.  The Court in <u>Buckley v. Valeo</u>, however, emphasized, in rejecting a challenge to campaign finance disclosure laws based on its alleged chilling effect on political association, that there was no record evidence of a chilling effect proving a violation of the right to association. <u>Buckley</u>, 424 U.S. at 71-72 (noting that failure to tender evidence of chilling effect lessened scrutiny applied to First Amendment challenge to campaign donation disclosure laws).

Seizing on this apparent evidentiary requirement, several lower courts have rejected right of association challenges for lack of evidence of a chilling effect.  <u>See</u>, <u>e.g.</u>, <u>Richey v. Tyson</u>, 120 F.Supp.2d 1298, 1324 (S.D. Ala. 2000) (requiring, in challenge of campaign finance law, evidence of a "reasonable probability" of threats, harassment, or reprisals "from sources such as specific evidence of past or present harassment of members or of the organization, a pattern of threats, specific manifestations of public hostility, or conduct visited on organizations holding similar views"); <u>Alabama State Federation of Teachers, AFL-CIO v. James</u>, 656 F.2d 193, 197 (5th Cir. Unit B Sept. 17, 1981) (rejecting right of association challenge for lack of evidence of chilling

AO 72A
(Rev.8/82)

effect);  Int'l Organization of Masters, Mates, and Pilots, 575 F.2d 896, 905

(D.C. Cir. 1978) (same).

But the Eleventh Circuit has drawn a distinction between challenges to

political campaign donation disclosure rules of the sort at issue in Buckley and

Richey and challenges to government investigations into "particular political

group or groups" of the sort in NAACP and at issue in this case.  See In re

Grand Jury Proceedings, 842 F.2d at 1236.  In doing so, the Eleventh Circuit

suggested that a  "more lenient" showing applies to targeted investigations

because "the government investigation itself may indicate the possibility of

harassment."  Id.; see also Pollard v. Roberts, 283 F. Supp. 248, 258 (D.C. Ark.

1968), aff'd per curiam 393 U.S. 14, 89 S. Ct. 47, 21 L. Ed. 2d 14 (1968)

(finding prosecutor's attempt to subpoena the names of contributors to a

political campaign unconstitutional, despite "no evidence of record in this case

that any individuals have as yet been subjected to reprisals on account of the

contributions in question," because "it would be naive not to recognize that the

disclosure of the identities of contributors to campaign funds would subject at

least some of them to potential economic or political reprisals of greater or

lesser severity"); cf. also Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d

1358, 1366-67 (11th Cir. 1999) (concluding, without discussing record evidence of chilling effect, that statute which required disclosure of names of principal stockholders of adult entertainment establishments was abridgement of First Amendment).

In addition, concerns about the economic vulnerabilities of public employees have led courts to more easily find the presence of a chilling effect on disclosure rules imposed on public employees. See, e.g., Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. Waterfront Commission of New York Harbor, 667 F.2d 267, 271-72 (2d Cir. 1981). Where the government has "pervasive control over the economic livelihood" or "professional destiny" of its employees, it may be obvious that compelling disclosure of organizational affiliations under threat of discipline could create a "substantial danger" of an "inevitable" chilling effect. Id. Thus, when examining freedom of association challenges in the public employment context, courts have applied a "common sense approach." Id. at 272; see also Shelton, 364 U.S. at 486 (noting, in finding questionnaire distributed to public teachers inquiring into their organizational memberships unconstitutional, that burden on teacher's freedom to associate was "conspicuously accented when the teacher serves at the

absolute will of those to whom the disclosure must be made," and not

discussing evidence of chilling effect); <u>Fraternal Order of Police</u>, 812 F.2d at

119-20 ("We recognize that the record contains no evidence that would support

a finding that a required response to this question would chill the applicant's or

family member's associational activities. However, in light of the absence of

any legitimate interest asserted by the City to justify the inquiry, we conclude

that the question would not even withstand a more relaxed scrutiny than that

usually applied to questions which seek disclosure of associational ties.").

  Here, unlike in <u>NCAAP</u>, there is no evidence in the record that any

economic reprisals have occurred as a result of any police officer's affiliation

with Local 491 in the past.  Nor is there evidence that any adverse action is

reasonably likely to be taken against members of the Local 491 in the future,

even against those who may have disclosed their participation in a political

effort to replace Chief Walters.  Nevertheless, Sgt. Jolly testified that such

"secret investigations" of police officers and inquiries into their political

activities "do have, whether intended or otherwise, a chilling effect on people's

willingness to both join [Local 491] and then to be active in the organization."

(Jolly Dep. [32-12] at 17.)

In view of the considerations outlined above, and in view of the substantial difficulties associated with proving the existence of a chilling effect, the Court concludes that under the facts of this case, Plaintiffs have adequately demonstrated that a chilling effect was reasonably likely to result from Defendants' inquiries into Plaintiffs' off-duty union activity.  It hardly can be doubted that employees will be deterred from associating with an organization reputed for being critical of their superiors, if they are aware that they may, without substantial justification, be subjected to compelled questioning about their organizational activities.  The Court therefore concludes that the evidence demonstrates as a matter of law that the Internal Affairs inquiry into the off-duty union activities of members of the Local 491 violated the First Amendment.

     5.    <u>Remedy</u>

Having concluded that Defendants unconstitutionally inquired into protected associational activities, the Court turns to examine the appropriate remedy.  As stated, Plaintiffs seek both declaratory and injunctive relief.

To have standing to seek permanent injunctive relief, Plaintiffs must demonstrate a real and immediate threat that they will be subject to the

AO 72A
(Rev.8/82)

unconstitutional questioning by the Gwinnett County Police Department in the future. See City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983). "Simply because a party prevails on the merits of a constitutional claim does not mean that the party is automatically entitled to prospective injunctive relief." Wooden v. Bd. of Regens of Univ. System of Ga., 247 F.3d 1262, 1283 (11th Cir. 2001). While "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury," O'Shea v. Littleton, 414 U.S. 488, 496, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974), "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." Lyons, 461 U.S. at 102.

Here, besides pointing out that Defendants remain firm in the belief that their questioning was constitutional, Plaintiffs point to no evidence that would indicate Defendants are likely to improperly inquire into their protected associational activity without adequate justification in the future. There is, in other words, no evidence in the record that any member of Local 491 is immediately threatened with being interrogated by Internal Affairs officers concerning their off-duty union activities. As the above precedents make clear,

62

the fact that officers *may* be subject to such questioning does not confer the required standing to seek injunctive relief.  Moreover, any injunctive relief the court might award would not redress the injuries Plaintiffs suffered as a result of the unconstitutional questioning.  See Wooden, 247 F.3d at 1285 & n.21 (noting that where an alleged constitutional violation "had been completed well before Plaintiffs filed their complaint," Plaintiffs did not have standing to seek injunctive relief).  Because the Court finds Plaintiff do not have standing to pursue injunctive relief, the Court declines the request.

Nevertheless, the Court finds that Plaintiffs are entitled to a declaration of unconstitutionality.  Accordingly, insofar as Plaintiffs seek a declaration that the questioning of Sgt. Van Nus, Sgt. Jolly, and Det. Henry relating to their off-duty union activity violated the First and Fourteenth Amendments, their Motion for Summary Judgment is **GRANTED**.  Insofar as they seek injunctive relief on that claim, their Motion is **DENIED**.   Likewise, insofar as Defendants seek summary judgment, their Motion is **DENIED** as to declaratory relief and **GRANTED** as to injunctive relief.

### B.    Equal Protection Claim

Officer Fouchia claims that Defendants violated his rights under the

Equal Protection Clause because they treated him differently from similarly

situated police officers by declining to question Officer Fouchia as a part of

their inquiry into his alleged on-duty mutinous statements.  Defendants move

for summary judgment on this claim.

The Equal Protection Clause protects individuals from being disparately

treated by the government without justification.  Plaintiff here is not a member

of a protected class, and thus the rational basis test applies.  See Village of

Willowbrook v. Olech, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060

(2000).  Under that test, the plaintiff must demonstrate that he has been

"intentionally treated differently from others similarly situated and that there is

no rational basis for the difference in treatment."  Id. at 564.  Stated differently,

the state action must be "irrational and wholly arbitrary" in order to trigger

equal protection concerns.  Id. at 565.

In support of his claim, Plaintiff advances eight comparators who, unlike

Plaintiff, were informed of the inquiry proceedings against them and offered

opportunities to respond.  First, during "an inquiry as to whether [an officer]

referred to another officer as a rat," the subject of the inquiry was informed of

the allegations and given the opportunity to respond.  (See Pls.' Statement of

64

Material Facts [37-2] ¶¶ 17-18.)  Second, another officer who was investigated

for allegedly displaying a list of confidential informants to persons outside of

the department was given similar notice and an opportunity to respond.  (Id. ¶¶

19-20.)  Third, another investigated for possibly engaging in an unauthorized

investigation was given notice and an opportunity to respond.  (Id. ¶¶ 21-22.)

Fourth, an officer accused of favoritism was given notice and an opportunity to

respond.  (Id. ¶¶ 23-24.)  Fifth, an officer who may have been involved in the

local drug scene was given notice and an opportunity to respond during an

investigation into his conduct.  (Id. ¶¶ 25-26.)  Sixth, an officer accused of

creating a hostile work environment was afforded similar process.  (Id. ¶¶ 27-

28.)  Seventh, an officer accused of making sexually suggestive comments was

given notice and an opportunity to respond.  (Id. ¶¶ 29-30.)  And finally, an

officer accused of making racially insensitive comments was given notice and

an opportunity to respond.  (Id. ¶¶ 31-32.)

        "When a plaintiff alleges discriminatory discipline, to determine whether

employees are similarly situated, we evaluate 'whether the employees are

involved in or accused of the same or similar conduct and are disciplined in

different ways.'"  See Burke-Fowler v. Orange County, 447 F.3d 1319, 1323

AO 72A
(Rev.8/82)

(11th Cir. 2006) (quoting <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1368 (11th Cir. 1999)).  When making that determination, the Eleventh Circuit has required that "that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing [] reasonable decisions and confusing apples with oranges."   <u>Id.</u>  Indeed, the Eleventh Circuit has recently reaffirmed that it is the "nearly identical" standard, and not the "similarly situated" standard, that controls.  <u>Id.</u> at 1323 n.2.

Applying that standard, the Court concludes that Plaintiff has failed to come forth with valid comparators in support of his circumstantial case of disparate treatment.  Unlike Plaintiff, none of the eight comparators evidenced by Plaintiff was the subject of an inquiry into alleged "mutinous" statements or conduct amounting to disloyalty or insubordination of superior officers in the chain of command.  The conduct for which Plaintiff was being investigated was not "nearly identical" to any of the eight comparators advanced by Plaintiff, and, as such, may not form the basis of a valid comparison.

Even it were to assume that Plaintiff has come forth with valid comparator evidence, however, the Court would conclude that Plaintiff has failed to demonstrate how the failure of the Internal Affairs officers to provide

66

Plaintiff with notice and an opportunity to respond to an informal inquiry amounted to arbitrary or irrational state action.  When concerned with allegations of the sort at issue here, a police department may well elect to proceed with caution, and avoid implicitly accusing an officer of disloyalty before adequate investigation.  Providing such notice and subjecting him to questioning may undermine morale or further advance disloyalty within the ranks of the police department.   Furthermore, requiring a police department to inform an officer of the initiation of an informal internal affairs investigation could undermine the effectiveness of the investigation.  It cannot be said that there is no rational basis for declining to notify an officer of a pending informal inquiry or declining to offer him an opportunity to respond before any formal charges or disciplinary action is brought against him.

In short, Plaintiff Fouchia has failed to come forth with any evidence that the failure to inform Officer Fouchia of the informal inquiry against him was the result of intentionally disparate treatment.  Insofar as they move for judgment as a matter of law on this claim, Defendants' Motion for Summary Judgment is **GRANTED**.

67

## Conclusion

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment [28] is **GRANTED in part and DENIED in part.** It is granted insofar as Plaintiffs seek a declaration that the questioning of Sergeant Van Nus, Sergeant Jolly, and Detective Henry relating to their off-duty union activity in connection with an investigation which had the sole purpose of determining whether another officer may allegedly disloyal on-duty statements, violated the First and Fourteenth Amendments. It is denied in all other respects.

Defendants' Motion for Summary Judgment [32] is **GRANTED in part and DENIED in part**. It is granted insofar as Defendants seek judgment as a matter of law on Plaintiffs' challenge to Defendants' uniform policy and Plaintiff Fouchia's Equal Protection claim. It is denied insofar as it seeks judgment as a matter of law on Plaintiff's challenge to the Internal Affairs Investigation.

The Clerk is **DIRECTED** to **CLOSE** this case.

AO 72A
(Rev.8/82)

**SO ORDERED** this <u>  4th  </u> day of May, 2007.


<u>                                        </u>
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)